UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Konstantin Ioannidis and
Erika Dilbarian

v.                                          Case No. 1:24-cv-30-PB-AJ
                                            Opinion No. 2026 DNH 061

Polaris Industries Inc., et al.


MEMORANDUM AND ORDER

Konstantin Ioannidis was injured while participating in a guided snowmobile tour. He and his wife, Erika Dilbarian, sued Polaris Industries Inc., Polaris Experience, LLC, and Winter Fun, Inc. for negligence, strict product liability, breach of warranty, violation of the New Hampshire Consumer Protection Act, and loss of consortium. The defendants have responded with motions for summary judgment arguing that the plaintiffs' claims are barred by the exculpatory contracts they signed before they participated in the tour. The defendants also argue that the plaintiffs' product liability claim fails even if the exculpatory contracts are unenforceable because the defendants neither manufactured nor sold the allegedly defective helmet on which that claim is based.

## I. BACKGROUND

Winter Fun is a "Polaris Adventure Outfitter." Doc. 40-1 at 6. As an outfitter, Winter Fun entered into an agreement with Polaris Experience, LLC to "provide customers with rides and tour experiences using Polaris vehicles." Id. Pursuant to the agreement, Polaris supplies the vehicles used on the tours and Winter Fun supplies any required safety equipment, including helmets.[1] Id.

On January 28, 2021, Ioannidis and Dilbarian booked a "Polaris Adventures" guided snowmobile ride for the next day. Id. at 6-7. The plaintiffs understood when they booked the tour that the defendants "agreed to provide all necessary equipment, including the snowmobile itself, outdoor weather gear, and a helmet, and then lead a group on a guided snowmobile ride." Doc. 1 at 13. On the day that the plaintiffs booked the tour, Winter Fun sent them an email confirming their reservation. Doc. 40-1 at 7; see also Doc. 40-3 at 1-4. That email stated, in bold letters, that "[a]ll riders need to complete the waivers and check-in paperwork" and "[a]ll riders need to watch the safety video" before arriving at their office for the tour. Doc. 40-3 at 1, 3.

---

[1]     Polaris Experience appears to be a subsidiary of Polaris Industries. The plaintiffs allege that Polaris Experience and Winter Fun are joint venturers. Doc. 1 at 13. Winter Fun contends that it works with Polaris Experience as an independent contractor. Doc. 40-1 at 6.

Both plaintiffs followed Winter Fun's directions and completed a "Rental Agreement" and a "Voluntary Waiver, Consent, Release, and Hold Harmless Agreement."[2] Doc. 39-3 at 5; see also Doc. 39-5.

The Voluntary Waiver contains a series of exculpatory clauses, including the following:

> RIDING IS VOLUNTARY; YOU ARE NOT REQUIRED TO PARTICIPATE.
>
> In consideration for being allowed to rent, drive, ride in and/or utilize an snowmobile . . . I agree to assume all risks, waive all claims, release all liability, and defend and hold Winter Fun Inc DBA Northeast Snowmobile and ATV Rentals ("Outfitter") and Polaris Industries Inc. ("Polaris"), their directors, officers, agents, affiliates, subsidiaries and parent companies, harmless to the fullest extent allowed by law.
>
> I am aware of and voluntarily assume the DANGERS AND RISKS OF SERIOUS INJURY, DAMAGE, OR DEATH that exist in my use of the vehicles and equipment which could be or may be caused by loss of vehicles control, collisions, mechanical failures, trail conditions, my own negligent acts, the negligent acts of other riders, and the potential negligence of the Outfitter and Polaris, including the failure to adequately screen, train, warn, or otherwise protect me from all these risks.
>
> I AGREE TO WAIVE TO THE FULLEST EXTENT ALLOWED BY LAW ANY AND ALL CLAIMS OF ANY KIND that I have or may have in the future relating to the Rental Opportunity, whether directly or by subrogation or otherwise, against the Outfitter, Polaris, any Polaris dealership, industry association, and/or any of their directors, officers, subsidiaries,

---

[2]    I refer to the Rental Agreement and the Voluntary Waiver together as the "Exculpatory Contracts.'

affiliates, employees, agents, successors or assigns (collectively, "Rental Opportunity Sponsors").

I AGREE TO RELEASE THE RENTAL OPPORTUNITY SPONSOR FROM ANY AND ALL LIABILITY for any loss, damage, expense or injury (including death) that I or my next of kin may incur resulting from my participation in the Rental Opportunity. I understand this waiver and release does not extend to intentionally wrongful acts on the part of the Rental Opportunity Sponsors.

I AGREE AND UNDERSTAND that, on behalf of myself, my personal representatives and my heirs, I AM RELINQUISHING ANY AND ALL RIGHTS I NOW HAVE OR MAY HAVE IN THE FUTURE TO SUE the Rental Opportunity Sponsors for any and all injury, damage, or death I may suffer arising from the vehicle or its equipment, or participation in the Rental Opportunity, including claims on the Rental Opportunity Sponsor's negligence.

Doc. 39-5 at 2-3. The Rental Agreement further states that:

The undersigned hereby rents from Winter Fun Inc . . . the snowmobile ("vehicle") and/or related equipment for a limited period of time, upon the following terms and conditions.

NO WARRANTY – INHERENTLY DANGEROUS ACTIVITY – NO INSURANCE PROVIDED

Outfitter makes no warranty of any kind, nature or description, express or implied, as to the quality and manufacture, safety, drivability, or fitness for any particular purpose of any vehicle or equipment covered by this agreement. I, the undersigned, accept my vehicle or other equipment provider by Outfitter in its "as is" condition with all faults. I hereby acknowledge that the vehicle is a dangerous activity, with a high risk of serious bodily injury or death to oneself or others . . . I personally accept all risks and liabilities of this activity . . . I understand that by executing this document I am giving up important legal rights . . .

Id. at 4.

Before commencing their tour, the plaintiffs watched a safety video that instructed them to "operate [the snowmobile] . . . only to the limits of their ability" and "review the safety warnings" on the snowmobile. Doc. 40-4 at 107. The video also warned that "improper use of the snowmobile can lead to severe injury or death." Id. at 107. Winter Fun employees additionally gave the plaintiffs an "oral safety briefing" before the ride began. Id. at 108-09.

Ioannidis and Dilbarian were given helmets to wear while on the tour. Id. at 111. Ioannidis's helmet began to fog up as soon as he put it on. Id. at 119. When he complained, a Winter Fun employee told him to "crack the visor," but the problem persisted. Id. at 111; Doc. 1 at 14. Shortly after the tour began, Ioannidis was severely injured when he crashed his snowmobile into a tree after accelerating from a stop sign. Id.; Doc. 40-4 at 141-49. He contends that the foggy helmet caused the crash. Doc. 1 at 14.

The plaintiffs originally brought this action in New Hampshire state court. Doc. 1 at 1. They advanced five counts: (I) negligence and negligent misrepresentation; (II) strict product liability; (III) breach of warranty; (IV) violations of the New Hampshire Consumer Protection Act ("CPA"), RSA § 358-A:2 et seq.; and (V) a loss of consortium. Id. at 14-19. The Polaris defendants removed the action to federal court based on diversity of citizenship. Id. at 2-7.  The Polaris defendants and Winter Fun later filed these separate motions for summary judgment. Doc. 39; Doc. 40.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if a factfinder could resolve the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). Once the movant has properly presented such evidence, the burden shifts to the nonmovant to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in [its] favor," Irobe, 890 F.3d at 377 (alteration in original) (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). If the nonmovant fails to adduce such evidence on which a reasonable factfinder could base a favorable verdict, the motion must be granted. Celotex, 477 U.S. at 324. In

6

considering the evidence, I must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

## III.  ANALYSIS

The defendants argue that all of the plaintiffs' claims are barred by the Exculpatory Contracts. They also contend that the plaintiffs' strict product liability claim fails even if the Exculpatory Contracts are unenforceable because the defendants neither manufactured nor sold the allegedly defective helmet. I examine each argument in turn.

## A.    The Exculpatory Contracts

The parties have different views as to the law that governs the enforceability of exculpatory consumer contracts in lease agreements for goods. The defendants base their contention that the Exculpatory Contracts are enforceable on a well-developed body of New Hampshire common law that addresses the enforceability of exculpatory contracts generally. Under that law, exculpatory contracts can be used to preclude remedies that would otherwise be available to an injured party only if: "(1) they do not violate public policy; (2) the plaintiff understood the import of the agreement or a reasonable person in his position would have understood the import of the agreement; and (3) the plaintiff's claims were within the contemplation of the parties when they executed the contract." Dean v. MacDonald, 147 N.H. 263,

7

266-67 (2001) (citing Barnes v. N.H. Karting Assoc., Inc., 128 N.H. 102, 106-07 (1986)). The defendants rely on the common law test in arguing that the Exculpatory Contracts are enforceable and bar all of the plaintiffs' claims.

The plaintiffs respond by claiming that the common law test has been displaced in cases involving lease agreements for goods by RSA § 382-A:2A-503.[3] Section 503 is part of Article 2A of New Hampshire's Uniform Commercial Code, which governs lease agreements for personal property. Subsection 3 of that section provides in pertinent part that any "[l]imitation, alteration, or exclusion of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable." RSA § 382-A:2A-503(3). The plaintiffs argue that § 503(3) applies to all of their claims because the Exculpatory Contracts are part of an agreement among the parties that included a lease of consumer goods to the plaintiffs for use on the tour. Therefore, they argue that § 503(3)'s unconscionability test, not the common law test, should be used to determine whether the Exculpatory Contracts are enforceable.[4]

---

[3]    For the sake of brevity, I hereafter refer to RSA § 382-A:2A-503 as "§ 503.'
[4]    In analyzing this argument, I do not mean to imply that the common law test and the test required by § 503(3) are materially different. That issue has not been briefed.

I begin by assessing the plaintiffs' contention that § 503(3) entirely displaces the common law that governs the enforceability of exculpatory consumer contracts. Then, I separately consider how the Exculpatory Contracts affect each of the plaintiffs' claims for relief.

1. Section 382-A:2A-503(3)

I am unpersuaded that RSA § 382-A:2A-503(3) sweeps as broadly as the plaintiffs claim. First, § 503(3) is cast as an exception to the general rule set forth in § 503(1) that a lease "may limit or alter the measure of damages recoverable under this Article." RSA § 382-A:2A-503(1) (emphasis added). Because the general rule in § 503(1) reaches only limitations on damages that are recoverable under Article 2A, it is difficult to see how § 503(3) can be read to reach other types of damage claims that are not authorized under Article 2A. Second, this reading of § 503 is reinforced by the exception recognized in § 503(3) itself because that exception expressly covers only limitations on claims for "consequential damages," which is a term typically used to describe damages that are recoverable for breach of contract or breach of warranty. See e.g. Salem Eng'g & Constr. Corp. v. Londonderry Sch. Dist., 122 N.H. 379, 383-84 (1982) (describing consequential damages as a type of damages that can be recognized for breach of contract and explaining that "the scope of foreseeability with respect to damages is narrower in contract cases than in

tort cases"). Thus, I conclude that § 503(3)'s limitation only applies to claims brought under Article 2A.

In this case, the plaintiffs' only claim arising under Article 2A is their claim for breach of warranty. Accordingly, I reject the plaintiffs' argument that the enforceability of the Exculpatory Contracts as to their other claims should also be determined using § 503(3) and apply that provision only to the plaintiffs' breach of warranty claim.

2.    Negligence Claim

The defendants rely on the common law test to argue that the Exculpatory Contracts bar the plaintiffs' negligence claim because: (1) the contracts plainly cover the negligence claim; (2) a reasonable person in the plaintiffs' position would have understood the contracts; and (3) the contracts are not contrary to public policy, as "no special relationship existed among the parties and there was no other disparity in bargaining power." Barnes, 128 N.H. at 106. The plaintiffs respond solely by contending that the Exculpatory Contracts were presented to the plaintiffs on a "take-it-or-leave-it" basis only after the cost of the tour had become nonrefundable, creating a disparity in bargaining power among the parties and making the contracts unenforceable. Thus, the only real issue here is whether the "take-it-or-leave-it" nature of the Exculpatory Contracts created

a disparity in bargaining power among the parties which would render them contrary to public policy.

Both this Court and the New Hampshire Supreme Court have previously addressed whether recreational activity waivers are contrary to public policy. In Lizzol v. Brothers Property Management Corporation, a judge on this Court found that there was no disparity in bargaining power between parties who entered into a waiver before a snowmobiling tour, despite the fact that the plaintiffs needed to sign that waiver in order to participate in the tour. 2016 DNH 199, 2016 WL 6459570, at *8 (D.N.H. Oct. 31, 2016). There, the Court explained that "the plaintiffs were 'under no physical or economic compulsion to sign the release,' and '[s]ince the defendants' service [was] not an essential one, the defendants had no advantage of bargaining strength' over the plaintiffs or others who sought to participate in the snowmobile lesson and tour." Id. (first alteration in original) (quoting Barnes, 128 N.H. at 108). In Barnes, the New Hampshire Supreme Court similarly determined that the plaintiff was under "no physical or economic compulsion" to sign a release of liability, even though he was required to sign it in order to use the racetrack at issue. 128 N.H. at 108. And, in McGrath v. SNH Development, Inc., the court found no disparity in bargaining power despite the fact that the plaintiff had to sign a waiver in order to receive her season pass at a ski mountain. 158 N.H. 540, 544-45

11

(2009). In all three cases, the courts determined that the waiver contracts were not contrary to public policy even though they were presented to the plaintiffs on a "take-it-or-leave-it" basis.

The only fact that differentiates the present case from these cases is that here the plaintiffs were not notified that they would be required to sign the Exculpatory Contracts until after their payment for the tour had become nonrefundable. Doc. 42-1 at 6; see also Doc. 40-8 at 5 (Rental Agreement requiring the plaintiffs to agree that "I cannot get a refund on my reservation unless I notify Outfitter 48 hours or further in advance . . . ."); Doc. 40-3 at 2 (email from Winter Fun confirming reservation, noting that the tour requires a "100% advance payment on all snowmobile reservations" and that "[n]o refunds will be given within 7 days prior to your reservation date"). The plaintiffs argue that these inflexible refund policies produced an unacceptable disparity of bargaining power among the parties because they could not refuse to sign the Exculpatory Contracts without forfeiting the full cost of the rental and tour.

Courts in other jurisdictions are split as to whether an exculpatory contract is contrary to public policy when the party accepting the contract has already paid a nonrefundable deposit. In Patterson v. PowderMonarch, LLC, the Tenth Circuit held that an exculpatory agreement was fairly entered into despite the fact that the plaintiff "would have forfeited the $ 57 she paid for

12

her lift ticket, plus the travel costs she had incurred to reach the resort, if she had chosen not to accept the release of liability." 926 F.3d 633, 640 (10th Cir. 2019). Surveying the relevant case law in Colorado, the Tenth Circuit held, "[A]ll of the pertinent authorities indicate that [the fair entry factor] will generally be satisfied where the contract relates to a non-essential recreational activity, absent evidence of unusual circumstances such as incompetency." Id. at 641. Conversely, in Kretzschmar v. Big Horn Power Sports, LLC, the plaintiff became aware of and signed an exculpatory agreement only after he had paid a nonrefundable $500 deposit and signed a purchase agreement for a motorcycle and customization kit. 2013 WL 11879674, at *4 (D. Wyo. Oct. 7, 2013). In an affidavit, he said he "did not feel that [he] had any choice but to sign the [Waiver]." Id. at *3. There, the court found that the "[p]laintiff signed the Waiver under pressure and out of fear of losing his $500 deposit" and thus determined that his allegations raised a genuine issue of material fact as to whether the contract was fairly entered into. Id.[5]

---

[5]    Colorado and Wyoming courts evaluate whether an exculpatory agreement is enforceable under four factors: "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; (4) whether the intention of the parties is expressed in clear and unambiguous language.' Patterson, 926 F.3d at 639 (quoting Jones v. Dressel, 623 P.2d 370, 376 (Colo. 1981) (en banc)); see also Kretzschmar, 2013 WL 11879674, at *3 (same). Under this test, a contract is not "fairly entered into' when there is a disparity of bargaining party between the

Considering the totality of facts before me, I am satisfied that the nonrefundable deposit at issue here is not sufficiently coercive to distinguish this case from Lizzol, McGrath, and Barnes. Rather, the record makes clear that the plaintiffs "freely chose[] to enter into the contract" and no legally cognizable disparity in bargaining power existed among the parties. Barnes, 128 N.H. at 108. The plaintiffs were aware that their participation in the snowmobile tour was voluntary. See Doc. 39-5 at 2 ("RIDING IS VOLUNTARY"); Doc. 40-4 at 93-94 (Ioannidis's testimony that the rental activity was voluntary). Moreover, just as in Lizzol, McGrath, and Barnes, the activity here—snowmobiling—is "not an essential [service]," and thus "the defendants had no advantage of bargaining strength." Lizzol, 2016 WL 6459570, at *8 (quoting Barnes, 128 N.H. at 108). The plaintiffs do not argue that this was the only snowmobiling opportunity available to them, nor do they indicate that an exigency existed that compelled their assent to the

_____

parties. See Patterson, 926 F.3d at 639-40 ("A contract is fairly entered into if one party is not so obviously disadvantaged with respect to bargaining power that the resulting contract essentially places him at the mercy of the other party's negligence.') (quoting Hamill v. Cheley Colo. Camps, Inc., 262 P.3d 945, 949 (Colo. App. 2011)); see also Kretzschmar, 2013 WL 11879674, at *3 ("[I]f there is a vast disparity in bargaining power between the parties a court may find that the contract was unfairly entered into.'). Therefore, while the Tenth Circuit does not employ the same test for exculpatory contracts as the New Hampshire Supreme Court does, its cases are useful analogues in determining what constitutes a disparity in bargaining power that would render a contract "unfairly entered into.'

Exculpatory Contracts. See Restatement (Second) of Torts § 496B, cmt. j (A.L.I. 1965) (defining "disparity of bargaining power"). And, although the Tenth Circuit applies a slightly different test to evaluate the fairness of exculpatory contracts, I am persuaded by that court's reasoning in Patterson, where it held that the requirement that a contract was fairly entered into "will generally be satisfied where the contract relates to a non-essential recreational activity, absent evidence of unusual circumstances such as incompetency." 926 F.3d at 641.[6] Here, where the Exculpatory Contracts involved a non-essential recreational activity and the plaintiffs voluntarily entered into the agreements, the small financial penalty the plaintiffs may have incurred if they refused to sign the agreements is not sufficiently coercive to prevent the defendants from enforcing the Exculpatory Contracts. Accordingly, I grant the defendants' requests for summary judgment on the plaintiffs' negligence claim.

3.    Strict Product Liability Claim

The plaintiffs next argue that the Exculpatory Contracts cannot be used to bar their strict product liability claim.

---

[6]    Moreover, the facts of the present case are distinguishable from Kretzschmar. There, the "[p]laintiff signed the Waiver under pressure and out of fear of losing his $500 deposit.' Kretzschmar, 2013 WL 11879674, at *4. Here, conversely, Ioannidis's affirmed at his deposition that "No one forced [him] to enter into this agreement' and he was "free not to sign it if [he] did not want to waive [his] rights.' Doc. 40-4 at 95.

When the New Hampshire Supreme Court first recognized the strict product liability tort in 1969, it "explicitly adopted the doctrine of strict liability set forth in Restatement (Second) of Torts § 402A." 8 N.H. Practice § 8.01 (citing Buttrick v. Lessard & Sons, Inc., 110 N.H. 36 (1969)). And the court continues to rely on § 402A when describing its product liability law. See, e.g. Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 831 (2005); Price v. BIC Corp., 142 N.H. 386, 388 (1997); Thibault v. Sears, Roebuck & Co., 118 N.H. 802, 812-13 (1978). Comment m to § 402A states that a strict liability claim "is not affected by any disclaimer or other agreement." Restatement (Second) of Torts § 402A cmt. m (A.L.I. 1965). This limitation is carried forward in § 18 of Restatement (Third) of Torts: Product Liability. And, as the reporters÷note to § 18 recognizes, "a clear majority of courts" have declined to enforce exculpatory contracts to bar strict product liability claims. See Restatement (Third) of Torts: Prods. Liab. § 18 & reporters÷note cmt. a (A.L.I. 1998) (citing § 402A cmt. m). Although the New Hampshire Supreme Court has not addressed this issue directly, I am confident that it will follow the majority rule. Thus, I conclude that the Exculpatory Contracts do not limit the plaintiffs÷strict product liability claim.

4.   Breach of Warranty Claim

Breach of warranty claims sound in contract and are governed by the New Hampshire÷s Uniform Commercial Code rather than the common law.

16

Sheehan v. N.H. Liquor Comm'n, 126 N.H. 473, 476 (1985). Accordingly, as noted above, the defendants÷claims that the Exculpatory Contracts bar the recovery of damages for breach of warranty are analyzed under § 382-A:2A-503 rather than the common law test.

Although the defendants argue in general that the Exculpatory Contracts bar the plaintiffs÷breach of warranty claim, they do not make reference to § 503(3) in their summary judgment papers. Nor do they otherwise explain how they can overcome that provision÷s presumption of unconscionability. Accordingly, the defendants have not shown that they are entitled to summary judgment on the plaintiffs÷breach of warranty claim.

5.    Consumer Protection Act Claim

The plaintiffs next argue that the Exculpatory Contracts have no effect on their CPA claim. I agree. RSA § 358-A:10(I) states in pertinent part that "[a]ny attempted waiver of the right to damages set forth in this paragraph shall be void and unenforceable.' RSA § 358-A:10(I). The defendants have failed to explain why this provision does not resolve the issue. Accordingly, I deny their motions for summary judgment with respect to the CPA claim.[7]

---

[7]    Although the defendants also present a bare bones argument that the plaintiffs cannot prove their CPA claim, I decline to address their argument because it has not been sufficiently briefed. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ( "The district court is free to disregard arguments that are not adequately developed').

17

5.    Loss of Consortium Claim

The defendants' challenge to Dilbarian's loss of consortium claim presents a nearly identical question to one I recently addressed in Dunn v. Northern Extremes Sports & Recreation, Inc., 2025 DNH 098, 2025 WL 2451220, at *3 (D.N.H. Aug. 19, 2025). There, I noted that "New Hampshire treats loss of consortium claims as independent of the underlying tort: they are 'separate and distinct' claims." Id. (quoting Brann v. Exeter Clinic, Inc., 127 N.H. 155, 160 (1985)). Therefore, I concluded, "a loss of consortium claim wholly belongs to the spouse, not the injured party," meaning that that the "power to waive liability rests with the spouse of the injured party." Id.

The defendants argue that the Exculpatory Contracts cover Dilbarian's loss of consortium claim through their "next of kin" language. See Doc. 39-5 at 3 ("I AGREE TO RELEASE THE RENTAL OPPORTUNITY SPONSOR FROM ANY AND ALL LIABILITY for any loss, damage, expense or injury (including death) that I or my next of kin may incur resulting from my participation in the Rental Opportunity"). However, because a loss of consortium claim is derivative, Ioannidis cannot waive Dilbarian's loss of consortium rights. See Dunn, 2025 WL 2451220, at *3. Therefore, the next of kin provision cannot be used to bar her claim. Nor can Dilbarian be deprived of her right to recover for loss of consortium based on her own agreement to be bound by the Exculpatory Contracts because those

18

Contracts only cover injuries that she or her next of kin suffered as a result of her own participation in the tour. Doc. 39-5. As in Dunn, the Contracts do not cover her loss of consortium claim because she seeks to recover damages for the injury she suffered because of her husband's participation in the tour. See Dunn, 2025 WL 2451220, at *4 ("If [the plaintiff] had stayed home [on the day of the snowmobiling accident], he could still assert a loss of consortium claim arising from his spouse's accident. The fact that [the plaintiff] himself also chose to use a snowmobile that day and sign a waiver relating to his own participation in the activity does not destroy his loss of consortium claim."). Therefore, because Ioannidis cannot waive Dilbarian's right to hold the defendants liable under a loss of consortium theory, and she did not waive her right to recovery by entering the Exculpatory Contracts, the defendants are not entitled to summary judgment on Dilbarian's loss of consortium claim.

B.    Strict Product Liability as Lessor

The defendants alternatively contend that they cannot be held liable on the plaintiffs' strict product liability claim because they neither manufactured nor sold the allegedly defective helmet. The plaintiffs argue in response that their strict product liability claim is viable because the defendants leased the helmet to Ioannidis when he agreed to go on the tour.

The New Hampshire Supreme Court has addressed efforts to extend strict product liability to defendants who were neither manufacturers nor sellers on several occasions. In Brescia v. Great Road Realty Trust, for example, the court declined to hold a defendant who leased a crane strictly liable for the machine's alleged defects because he was "not in the business of supplying cranes." 117 N.H. 154, 157 (1977). In reaching this conclusion, the court noted that "the occasional seller" ordinarily will not be subjected to strict product liability and, accordingly, "to the extent the doctrine is applicable to a lease agreement, it would seem to be applicable only where the lease in question represents something more than business happenstance on the part of the lessor." Id. Cf. Lokken v. U-Haul of N.H., Inc., no. 219-2016-CV-272, slip op. at 2 (N.H. Super. Ct. Feb. 18, 2000) (applying strict product liability to moving truck rental company because its lease of a van "was not business happenstance, but instead was part of its core business").

The court has also made it clear that it will not subject service providers to strict product liability merely because an allegedly defective product was used when providing a service. In Bolduc v. Herbert Schneider Corporation, the court declined to hold a ski-area operator who was "not the manufacturer or seller of [a] tramway' and "provide[d] only a service' strictly liable for an accident that occurred on the tramway. 117 N.H. 566, 569-70 (1977). There, the court observed that "[e]ven when a product is used or

20

supplied in the course of and as an incident to the service, strict liability has usually been denied.' Id. at 569 (citation modified). Likewise, in Siciliano v. Capitol City Shows, Inc., the court declined to apply strict liability to an amusement-ride operator who "provides persons with a service; namely, a ride on a machine' and "does not sell or supply a product.' 124 N.H. 719, 730 (1984).

The present case involves a lease-service hybrid not squarely addressed by the New Hampshire Supreme Court, in which a product is leased in connection with the provision of a service. In similar cases, comment d to § 20 of the Restatement (Third) of Torts: Product Liability suggests that if the product and the service are billed separately, or the product is fully consumed while providing the service, courts will generally treat the defendant as a seller subject to strict product liability. Restatement (Third) of Torts: Prods. Liab. § 20 & cmt. d (A.L.I. 1998). But where the product is merely used in performing a service, the transaction will not typically be treated as a sale, and the service provider will not be held strictly liable for the product's defects. Id.

Given the New Hampshire Supreme Court's decisions in Brescia, Bolduc, and Siciliano, and the discussion in comment d, I believe that the New Hampshire Supreme Court would decline to hold the defendants strictly liable for any defects in the helmet they provided to Ioannidis. The plaintiffs

21

do not claim that they were charged separately for the lease of the helmet and the tour. Nor was the allegedly defective helmet "used up or consumed" by Ioannidis. Id. Instead, it was leased by the defendants merely "as an incident to" the plaintiffs÷participation in the guided tour. Buldoc, 117 N.H. at 569 (declining to apply strict liability where a product was provided "as an incident to" a service). Accordingly, I conclude that the defendants cannot be held strictly liable for any alleged defects in the helmet they leased to Ioannidis.

## IV.  CONCLUSION

For the foregoing reasons, I grant the defendants' motions for summary judgment with respect to the plaintiffs' negligence and negligent misrepresentation claim (Count I) and their strict product liability claim (Count II). In all other respects, their motions are denied. Doc. 39; Doc. 40.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

June 17, 2026

cc:    Counsel of Record

22